**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
**DIOCENES R. MARTINEZ,**

<b>Plaintiff,</b>

-against-

**COMMISSIONER OF SOCIAL SECURITY,**

<b>Defendant.</b>
------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:____ 5/3/2016
```

**14-CV-09115 (SN)**

**OPINION AND ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

Plaintiff Diocenes R. Martinez, proceeding pro se, brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). The Commissioner moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Martinez did not oppose the motion.

Because I conclude that substantial evidence supports the Commissioner's final determination, and because the administrative law judge ("ALJ") did not commit legal error, the Commissioner's motion is GRANTED, and the case is dismissed with prejudice.

<b>PROCEDURAL BACKGROUND</b>

Martinez received SSI as a minor; after his eighteenth birthday, his eligibility for benefits was reassessed under the criteria for adult applicants. On March 17, 2011, the Commissioner deemed that he was not disabled. On March 29, 2011, Martinez requested reconsideration of his disability determination, and on April 10, 2012, a hearing was held before a disability hearing officer. On May 2, 2012, the hearing officer affirmed the Commissioner's finding. On May 15,

2012, Martinez requested a hearing before an ALJ. On September 25, 2012, ALJ Lucian A. Vecchio held a hearing and on November 8, 2012, he issued a decision denying Martinez's claims for SSI. The ALJ's decision included a typographical error, listing the date of Martinez's initial denial of benefits as March 17, 2012, instead of March 17, 2011.

Martinez appealed the ALJ's decision, and the Appeals Council granted a request for review on August 6, 2014. On that date, the Appeals Council notified Martinez of its intention to uphold the ALJ's decision and gave him the opportunity to submit additional information to support his claims. Martinez submitted letters from himself and from his physician. On September 25, 2014, the Appeals Council adopted the ALJ's findings that Martinez was not disabled, but corrected the ALJ's error, finding that Martinez was not disabled as of March 17, 2011.

On December 1, 2014, Martinez, proceeding pro se, filed his complaint challenging the denial of his application for SSI. Martinez alleges that he is eligible for benefits because, although his "prosthetic pulmonary value is currently functioning well," he will "require regular monitoring for bioprosthetic valve dysfunction [and] will likely require several more valve replacement surgeries throughout his life." (Compl. ¶ 4.) Along with his motion, Martinez filed new materials to support his claim, including a letter from his physician and a visit summary from Weill Cornell Medical College. On November 6, 2015, the Commissioner filed a motion for judgment on the pleadings, arguing that the ALJ's decision is supported by substantial evidence and free of legal error. Martinez did not oppose the motion.

## FACTUAL BACKGROUND

**I.      Nonmedical Evidence and Martinez's Testimony**

Martinez was born in December 1992. At the age of one, he was diagnosed with tetralogy of fallot, and on February 16, 1994, he underwent surgery for a complete repair of his cardiac defect. From July to August 2007, Martinez worked as a summer camp counselor, a job which required him to walk and stand "most of the time" and occasionally lift up to ten pounds. (AR 180). In the summer of 2008, he worked as a paid intern at the same summer camp. His responsibilities included filing papers and answering phone calls. From July 2008 to September 2010, he worked as an intern for Assemblyman Adam Clayton Powell. Martinez graduated from high school in 2011 and currently attends Marymount Manhattan College full-time. He lives with his mother and stepfather and is currently unemployed.

In an Adult Disability Report dated November 29, 2010, Martinez stated that he was unable to perform strenuous activities and experienced anxiety, stress and comprehension problems. He wrote that his condition caused fluid to build-up in his lungs, and he would likely need another surgery in three or four years. Martinez reported that he took Motrin to treat his frequent headaches. He stated that cardiologist Dr. Gary Steinberg had surgically treated him for tetralogy of fallot and pulmonary valve replacement, and had recently performed an EKG and treadmill test. Martinez also reported receiving counseling for "emotional" problems. (AR 150.)

In a Functioning Report that Martinez submitted to the New York State Office of Temporary and Disability Assistance on January 4, 2011, he described his typical daily activities as follows: "wake up, get ready for school, go to school, do after school activities like dance, go to the gym, come home, eat, watch TV, shower, then go do [homework] and go to sleep." (AR 171.) Martinez wrote that he had no problems with personal care and reported that his mother

3

cooked all of his meals and performed all of the household chores. He wrote that he was able to use public transportation and drive a car. Martinez listed his leisure activities as using the computer, reading, watching television, dancing and drawing. He reported that dancing caused him to grow tired quickly. When prompted to explain how his illness or condition affected his abilities to perform various activities, Martinez wrote that his "chest may hurt a little" when lifting heavy objects, he became "a little tired" from walking, and he sometimes lost his breath from climbing stairs. (AR 176.) Martinez wrote the he was able to walk ten to fifteen blocks before needing to stop and rest for approximately three minutes.

In a Disability Report dated April 4, 2011, that Martinez filed in support of his appeal before the disability hearing officer, Martinez wrote that he was "limited to play[ing] certain sports and doing extreme work outs." (AR 195.) He stated that his illness did not affect his ability to care for his personal needs. Martinez reported that he grew tired easily and lost his breath when climbing stairs. At the end of his report, Martinez wrote: "I want you guys to take in consideration that I am a young man that has a physical disability. I can't play any sports with physical contact because I get tired easily and I feel like I'm suffocating. The doctors say that in the near future, I'll have another surgery done, aside from the two I have already." (AR 201.)

At the April 10, 2012 hearing before the disability hearing officer, Martinez testified that he had been enrolled in special education classes for reading and writing until seventh or eighth grade, when he was transferred to regular classes. He said that he was "hyperactive" in high school, but was never prescribed any medications. (AR 85.) Martinez stated that before his 2009 surgery, he felt tired. He said that after the surgery, he felt "a little better," but experienced sharp pains from laughing too much. Id. Martinez said that he might need another surgery to replace his artificial valve in five to twenty years from now.

4

Martinez's mother also testified at the April 10, 2012 hearing. She stated that from second to sixth grades, Martinez was in special education classes because he experienced difficulties with reading comprehension. She said that he occasionally experienced episodes of depression, but "dances and listens to music to fight it." (AR 86.) She said he did not perform chores because he was "always tired." Id. She stated that Martinez worked as a childcare provider for a summer program in 2007, but that he had never held a full-time job because he attended school full-time. She said that he might be able to work at McDonalds, but had too much school work and wanted to spend time with his friends. She said that he often went to the park or movies with his friends, and was able to use public transportation on his own.

On July 11, 2012, Martinez submitted a letter to the SSA in which he stated that anxiety about his health was causing him to lose sleep. He wrote that he suffered from "frequent chronic headaches," which led him to Cornell's pediatric emergency room on June 22, 2012. (AR 430.) He stated that he had a neurology appointment scheduled for August 21, 2012. Martinez also recounted an emergency room visit on December 16, 2010, when he sought treatment for chest, muscle and general pain. He wrote that his entire life was affected by his disability, and stated that his heart condition caused him emotional distress. Martinez wrote that he needed to continue to collect disability benefits during college in order to "be able to focus on my education and on recovering physically and mentally . . . ." (AR 431.)

At the hearing before the ALJ on September 25, 2012, Martinez testified that he would be capable of performing sedentary work, but that he would "most likely not" be able to perform a job that required lifting heavy objects. (AR 48.) Martinez testified that when he finished college, he planned to work as a film director. He said he was currently in his sophomore year and had "decent" grades. (AR 49.) When asked why he thought that he was disabled, Martinez said that

about once a week he grew short of breath and experienced occasional heart palpitations. He stated that since his two prior heart surgeries, he "never had a normal lifestyle." Id. Martinez said that he experienced chest pain twice a week, on average. He said that a recent stress test revealed a heart abnormality, and he had an upcoming appointment with a cardiologist to further evaluate the issue. Martinez testified that he sometimes had difficulty sleeping because he was worried about his heart condition. He said that his sleep loss issues had been especially acute around the time of his 2009 surgery.

Martinez's sister, Alexa Encarnacion, also testified at the hearing. She stated that Martinez was under a lot of pressure to perform well in school, and that it would be very difficult for him to balance school and work with his health condition. She testified that although Martinez "feels well sometimes," his family felt that "at least for a certain amount of time, at least until he graduates from college, to have the support from the Administration . . . would really be something that will help him and the family . . . ." (AR 51.)

## II.     Disability Opinions of Treating Physicians

### A.      Dr. Leonard Gary Steinberg, M.D.

While under the treatment of Dr. Leonard Gary Steinberg, a pediatric cardiologist at Weil Cornell Medical College, Martinez underwent pulmonary valve replacement surgery on July 14, 2009. According to the surgeon's notes, Martinez "tolerated the procedure well" and "sustained no appreciable intraoperative complications." (AR 273.) A radiology report dated July 17, 2009, indicated the presence of a "stable small left apical pneumothorax." (AR 345.) Otherwise, no post-operative complications were reported.

At a follow-up appointment on April 5, 2010, Dr. Steinberg characterized Martinez's post-operative recovery as "quite uneventful" and noted that he "continues to do extremely well

clinically." (AR 380–81.) During the examination, Dr. Steinberg noted a "widely split, 'clicky' S2" in Martinez's second chest cavity, but observed normal sounds in all other areas of his chest. (AR 381.) He also observed a "3/6 harsh, rough systolic ejection murmur over the left mid- and upper sternal border." Id. Dr. Steinberg noted that Martinez stated that he was doing "real good," claimed to be able to exercise harder, and denied "any palpitations, chest pain, dizziness, syncope, or other signs or symptoms referable to the heart." (AR 380.) Dr. Steinberg wrote that there was "no need for physical restrictions" and recommended that Martinez return in six months for a follow-up evaluation. (AR 381.)

On December 16 and 21, 2010, Martinez visited the emergency room at New York-Presbyterian Hospital, complaining of "strong chest pain." (AR 238.) A radiology report revealed an enlargement of Martinez's cardiac silhouette, but found no focal consolidation or pleural effusion.

In his visit notes from January 3, 2011, Dr. Steinberg wrote that in late December, Martinez began complaining of a "stabbing, poking" sensation over the mid-left sternal border, which later moved to his left lower chest and abdomen. (AR 365.) The pain responded to increased doses of ibuprofen. Dr. Steinberg ordered an electrocardiogram, which revealed a left axis deviation, but no voltage criteria for atrial enlargement, ectopy, or ST or T wave abnormalities. Dr. Steinberg concluded that Martinez's chest pain was likely not cardiac in origin. He wrote that since Martinez was "quite active in Spanish dance," he had arranged for him to undergo a treadmill exercise stress test. (AR 366.) In the meantime, he found that there was "no need for physical restrictions." Id.

On January 4, 2011, Martinez completed an exercise stress test. Dr. Steinberg observed a "normal heart rate and blood pressure response to exercise." (AR 371.) He wrote that there were

"no significant EKG changes" and "no symptoms of chest pain during the test." Id. Dr. Steinberg noted that Martinez's "endurance time was in the 10th percentile for his age, suggesting suboptimal conditioning." Id.

Dr. Steinberg examined Martinez again on January 26, 2012. He noted that his last echocardiogram performed on August 17, 2011, had revealed a bioprosthetic valve in the pulmonary position with mild residual stenosis and mild to moderate insufficiency. Dr. Steinberg reported that Martinez remained "very active in Spanish dance," and denied any palpitations, dizziness, syncope, or recent recurrence of chest pain. (AR 404.) He noted that he had reassured Martinez and his father that there was no need for physical restrictions.

On June 22, 2012, Martinez visited the emergency room complaining of "persistent vomiting, worsening migraine headaches, changes in vision and dizziness." (AR 443.) He was scheduled for a follow-up appointment with a specialist on August 21, 2012, and sent home with home care instructions on dealing with migraine headaches.

On July 19, 2012, Dr. Steinberg noted that Martinez complained of experiencing chest pain over the past month. He wrote that Martinez described the pain as "poking," not associated with exertion, occurring one or two times a week, lasting a few seconds, and subsiding when he breathed deeply and exhaled. (AR 420.) Dr. Steinberg added that "[d]espite this complaint, he continues to do well – though has stopped being very active in Spanish dance." Id. He scheduled Martinez for a "routine surveillance Holter monitor" and a treadmill exercise stress test. (AR 421.)

On July 23, 2012, Dr. Steinberg completed a medical source statement on Martinez's ability to perform work-related activities. He wrote that Martinez was capable of continuously lifting or carrying between 51 and 100 pounds, and was able to sit or stand without interruption

for up to eight hours a day. He noted no restrictions on Martinez's use of his hands, feet, hearing or vision, as well as no environmental limitations.

**B.      Dr. Marino Torres, M.D.**

In a letter dated March 23, 2012, Dr. Torres wrote that Martinez was born with congenital heart diseases (tetralogy of fallot), had open heart surgery as an infant and underwent a valve replacement surgery in 2010.[1] He noted that he "still needs to be followed very close and has some limited activity due to his heart condition." (AR 409.)

**III.      Disability Opinions of Non-Treating Physicians**

**A.      Dr. Michelle Perez, M.D.**

Dr. Michelle Perez examined Martinez on February 4, 2011. A physical examination revealed a regular heart rhythm with a V/VI systolic murmur. She diagnosed Martinez with tetralogy fallot repair, pulmonary valve replacement, and chest wall pain, by history. Dr. Perez assigned him a prognosis of "fair" and concluded that he had no restrictions, but "should avoid activities of moderate or greater levels of exertion." (AR 375.)

**B.      R. Gauthier, M.D.**

On March 17, 2011, state agency medical consultant Dr. R. Gauthier reviewed Martinez's medical records and completed a Physical Residual Functional Capacity Assessment. Dr. Gauthier concluded that Martinez was capable of occasionally lifting or carrying up to 20 pounds, standing or walking for between six to eight hours a workday, sitting for the same length of time, and lacked any postural, manipulative, or visual limitations. He noted that Martinez suffered from "occasional [shortness of breath] with exertion which subsides with rest." (AR 388.) He wrote that Dr. Steinberg had advised Martinez that he would likely need another valve

---

[1] Dr. Torres was mistaken about the date of Martinez's valve replacement surgery, which actually occurred on July 14, 2009. (See AR 378.)

replacement procedure in about five years. Dr. Gauthier found that "[c]laimant's allegation of a

heart problem is somewhat supported by the medical evidence in file but not to the extent

alleged" (AR 391), and concluded that Martinez was capable of performing "light work." (AR

392.)

In a follow-up report, Dr. Gauthier reviewed the results from Martinez's exercise stress

test, on which he had been able to exercise to over 13 METS.[2] Dr. Gauthier concluded that these

results revealed an "excellent aerobic capacity" that was "far above what it takes to perform

work as on the proposed RFC." (AR 393.)

State agency medical consultant Dr. Agatino Di Bella, M.D., reviewed Martinez's case

file in August, 2011, and affirmed Dr. Gauthier's findings.

### C.    Dr. Benjamin Kropsky, M.D.

Dr. Benjamin Kropsky examined Martinez on September 5, 2012. He noted that Martinez

had undergone surgeries for tetralogy of fallot at age one-and-a-half and for pulmanory valve

replacement in 2009. Dr. Kropsky wrote that Martinez reported experiencing left-sided chest

pain and that a stress test performed in August 2012 revealed "some abnormalities." (AR 423.)

He noted that Martinez was scheduled for another stress test and further cardiac evaluation on

September 11, 2012.

Martinez told Dr. Kropsky that he was never able to play sports and became short of

breath when running. He said he was able to walk slowly up to 10 to 15 blocks and could climb

two to three flights of stairs. Martinez also reported that he became tired easily and experienced

---

[2] To assess a patient's cardiovascular fitness and exercise capacity, doctors often measure the patient's maximal
oxygen consumption through a unit of measurement referred to as a MET, or metabolic equivalent. A MET
represents a patient's sitting/resting oxygen intake. Moderately active young men typically have a maximum oxygen
consumption level around 12 METs. See Gerald F. Fletcher, MD, et al., AHA Scientific Statement: Exercise
Standards for Testing and Training, American Heart Association (2001),
circ.ahajournals.org/content/104/14/1694.full.

headaches one to two times per week. Dr. Kropsky observed regular heart rhythm with a PMI in the left 5th intercostal space and a grade 3 to 4/6 systolic murmur over the precordium, radiating out to the anterior axillary line. (AR 424–25.) He diagnosed Martinez with congenital heart disease with tetralogy of fallot and a history of open heart surgery, chest pain of "uncertain etiology," and headaches. (AR 425.) He gave him a "fair" prognosis for each diagnosis. Dr. Kropsky concluded that Martinez required further evaluation for his chest pain, and was limited from activities that required moderate to severe exertion. He also found that Martinez might have further limitations, depending on the findings of the upcoming cardiac evaluation.

### D.      Dr. Sree Dev T.N. Chandrasekhar, M.D.

Dr. Chandrasekhar is a board-certified family physician and pediatrician, as well as a certified internist. At the hearing before the ALJ, Dr. Chandrasekhar stated that he had reviewed Martinez's medical record and listened to Martinez's and Ms. Encarnacion's testimony. He testified that Martinez had fallot tetralogy at birth, which was repaired when Martinez was approximately 18 months old. Martinez later had surgery to replace his pulmonary valve, and additional reports indicated that his recovery was favorable. Dr. Chandrasekhar testified that Martinez currently had a small ventricular septal defect that would require follow-up, but that his records reflect that his condition was "extremely favorable." (AR. 54.)

Dr. Chandrasekhar testified that none of Martinez's impairments met the requirements of the disabilities listed in the SSA regulations. When asked about the domains of functionality for children, Dr. Chandrasekhar testified that before turning 18, Martinez had a "less than marked limitation" to his health and wellbeing, due to a residual ventricular septal defect. (AR. 55.) In all other functional areas, Dr. Chandrasekhar testified that Martinez had no limitations. In response to the ALJ's question about Martinez's ability to perform at a sedentary level, Dr. Chandrasekhar stated that he saw no reason why Martinez could not perform a sedentary job.

**IV.    Additional Documents Submitted to this Court**

Martinez attached two documents to his complaint that do not appear elsewhere in the administrative record: a letter dated November 11, 2014, from Harsimran S. Singh, M.D., a doctor at the Cornell Center for Adult Congenital Heart Disease, and a summary of an October 31, 2014 visit with Dr. Singh. In his letter, Dr. Singh wrote that Martinez had a history of tetralogy of fallot repair, branch PA dilation in 1999, and pulmonary valve replacement in 2009. He stated that he had been treating Martinez since September 2012 and listed his current symptoms as "residual biventricular dysfunction . . . a long standing history of chest pains that have been difficult to treat," and heart palpitations. (Compl. 5.) Dr. Singh reported that Martinez's pulmonary valve was "currently functioning well but will require regular monitoring for bioprosthetic valve dysfunction." Id. He noted that Martinez likely would require "several more" valve replacement surgeries in the future. Id. Dr. Singh wrote that Martinez had "a long history of complications which prevents him from living a normal life of a person his age," and noted that Martinez was unable to participate in competitive sports. Id. He concluded that Martinez "has made excellent strides," but "will continue to need close follow up given his chronic medical condition." Id.

In the October 31, 2014 patient visit summary, Dr. Singh noted that in August 2012, Martinez had presented with a migraine without aura, "without mention of either intractable migraine or status migrainosus." (Compl. 9.) He recommended that Martinez return in six months for a follow-up appointment.

Martinez attached several additional documents to his complaint, all of which were already included in his administrative record. (Compare Compl. 7 with AR 224; Compl. 10 with AR 437; Compl. 11–12 with AR 257–58.)

12

**DISCUSSION**

## I.  Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995) (*per curiam*). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Comm'r of Soc. Sec'y, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence

standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and quotation marks omitted; emphasis in original)). "Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) ("Cruz I")). "The Act must be liberally applied, for it is a remedial statute intended to include not exclude." Cruz I, 912 F.2d at 11.

Though generally entitled to deference, an ALJ's disability determination must be reversed or remanded if it is not supported by "substantial evidence" or contains legal error. See Rosa, 168 F.3d at 77. Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) ("Rivera I") (citation omitted). Without doing so, the ALJ deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

When, as here, the Court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is a sufficient basis for granting the motion. See Wellington v. Astrue, 12 Civ. 03523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the

14

court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); Martell v. Astrue, 09 Civ. 01701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) (same); cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

Pro se litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see also Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal pro se standard in reviewing denial of disability benefits).

## II.     Definition of Disability

A claimant is disabled under the Act if he demonstrates an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage

in any other kind of substantial gainful work which exists in the national economy . . . ." 42

U.S.C. § 1382c(a)(3)(B).[3]

Under the authority of the Act, the Social Security Administration ("SSA") has

established a five-step sequential evaluation process when making disability determinations. See

20 C.F.R. § 416.920. The steps are followed in order: if it is determined that the claimant is not

disabled at a step of the evaluation process, the evaluation will not progress to the next step. The

Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. Where the claimant is not,
> the Commissioner next considers whether the claimant has a "severe
> impairment" that significantly limits her physical or mental ability
> to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment that is listed in 20 C.F.R.
> Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, she has the residual functional
> capacity to perform her past work. Finally, if the claimant is unable
> to perform her past work, the burden then shifts to the Commissioner
> to determine whether there is other work which the claimant could
> perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears

the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It

is only after the claimant proves that he cannot return to his previous work that the burden shifts

to the Commissioner to show, at step five, that other work exists in the national and local

economies that the claimant can perform, given her residual functional capacity ("RFC"), age,

---

[3] The statutory definition of "disability" in an SSI case under 42 U.S.C. § 1382c is "virtually identical" to
the standard applied to disability insurance benefits cases under 42 U.S.C. § 423. Hankerson v. Harris,
636 F.2d 893, 895 n.2 (2d Cir. 1980). Because the same standard of review applies, courts cite to cases
under 42 U.S.C. § 1382c and 42 U.S.C. § 423 "interchangeably." Id.

education, and past relevant work experience. 20 C.F.R. § 416.960(c)(2); <u>Melville</u>, 198 F.3d at 51.

## III.    The ALJ's Determination

In his November 8, 2012 decision, the ALJ found that Martinez's disability ended on March 17, 2012, and denied his SSI application. Although the ALJ determined that Martinez had several severe impairments, including a history of tetralogy of fallot and heart valve replacement, he found that these impairments did not singly or in combination meet or equal in severity any impairments listed in 20 C.F.R. Pt. 404, subpt. P, app. 1. The ALJ concluded that Martinez had the RFC to perform a full range of sedentary work, and that there were jobs that exist "in significant numbers in the national economy" that he could perform. (AR. 22.)

In reaching his RFC conclusion, the ALJ gave "significant weight" to the findings and opinions of Dr. Steinberg, consultative examiners and Dr. Chandrasekhar. (AR. 21.) He also considered Martinez's own testimony that he was able to perform sedentary work activities.

## IV.    The Appeals Council's Decision

On August 6, 2014, the Appeals Council granted Martinez's request for a review of the ALJ's decision and notified Martinez that it planned to adopt the ALJ's findings, but to correct the error as to the relevant date on which his disability had ceased.

In support of his appeal, Martinez submitted two letters: one from himself and one from his internist, Dr. Clarinelda Campusano, M.D. In his letter, dated September 1, 2014, Martinez wrote that although his heart had improved and he was feeling "physically fit," he worried about the prospect of undergoing another surgery in the future, and added "even if I physically feel okay, mentally I have gone through some break-downs." (AR 224.). He wrote that he was barely able to sleep at night, and spent his days trying to distract himself by hanging out with his

friends. Dr. Campusano's letter, dated September 2, 2014, was short and simply stated that she had begun treating Martinez in January 2014, and that he had a history of tetralogy of fallot with surgical repair at age 2 and pulmonary valve replacement in 2009.

On September 25, 2014, the Appeals Council issued an opinion adopting the ALJ's opinion in full, except to clarify that Martinez's disability ended on March 17, 2011, rather than March 17, 2012.

## V.    Analysis

On appeal, Martinez argues that the ALJ's decision was erroneous, not supported by substantial evidence in the record, and/or contrary to law. In her motion for judgment on the pleadings, the Commissioner argues that the ALJ applied the correct legal standards and his decision is supported by substantial evidence.

### A.    Substantial Evidence Standard

#### 1.    Severe Impairments

At step two of his analysis, the ALJ and Appeals Council limited Martinez's severe impairments to include a history of tetralogy of fallot and heart valve replacement; excluded from this list are Martinez's occasional migraines, nighttime anxiety and potential learning disability. Under the applicable regulations, an "impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). Additionally, to qualify as an impairment, the plaintiff's symptoms must have lasted or be expected to last for a period of at least 12 months. See 20 C.F.R. § 416.909.

There is substantial evidence to support the ALJ and Appeals Council's finding that Martinez's severe impairments are limited to a history of tetralogy of fallot and heart valve

replacement. In regard to his migraines, the record indicates that around November 2010 Martinez began taking Motrin for treatment of frequent headaches. He visited the emergency room on June 22, 2012, complaining of persistent vomiting, worsening migraine headaches, changes in vision and dizziness. The on-call doctor scheduled Martinez for a follow-up appointment with a neurologist on August 21, 2012, and sent him home with information on home care for migraines. In a letter to the SSA dated July 11, 2012, Martinez reported that he suffered from "frequent headaches," but did not indicate that these headaches significantly limited his physical or mental ability to perform basic activities. Although consultative examiner Dr. Kropsky included "headaches" in his list of diagnoses, he reported that Martinez's prognosis was "fair" and concluded that the headaches were not associated with any functional or cognitive limitations. Furthermore, when the ALJ asked Martinez to explain why he believed he was disabled, Martinez made no mention of his headaches.

Similarly, Martinez's complaints related to his anxiety and difficulty sleeping only appear sporadically throughout his medical records. There is no history of treatment for anxiety or sleep disorder, and Martinez reported that his sleep loss issues had been most severe around the time of his 2009 surgery—two years before the date on which the Commissioner determined Martinez was no longer disabled. Although Martinez reported that he "barely get[s] any sleep" due to anxiety about his illness, he was still able to attend school full-time, spend time with friends, and occasionally attend dance classes. (AR 224.) Martinez's busy academic and social life belie any contention that his anxiety and lack of sleep have interfered with his ability to perform basic work activities.

Finally, in regard to Martinez's potential learning disability, the records show that he was enrolled in special education classes for reading and writing until the seventh or eighth grade, at

which point he was placed in regular classes. There is no record that he was ever tested for or diagnosed with a learning disability. During high school, Martinez worked as an intern for a local politician and as an office worker for a summer camp. He graduated from high school in 2011 and reported receiving "a decent amount of good grades" in college. (AR 49.)

Because there is no evidence indicating that Martinez's headaches, anxiety and trouble sleeping, or potential learning disability interfere with his ability to do basic work activities, there is substantial evidence to support the ALJ and Appeal Council's finding that Martinez's severe impairments are limited to history of tetralogy of fallot and pulmonary valve replacement.

### 2.    Impairment Listings

At step three, the ALJ determined that none of Martinez's severe impairments, taken individually or in combination with each other, meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. To satisfy the requirements for the listed impairments of the cardiovascular system, a plaintiff must present evidence of a disorder that "affects the proper functioning of the heart or the circulatory system." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00(A)(1)(a). For impairments associated with congenital heart disease that result in "chronic heart failure with evidence of ventricular dysfunction," the AJL looks to Part 4.02, which lists the symptoms necessary for a finding of disability due to chronic heart failure. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00(H)(2). To qualify for a Listing impairment of chronic heart failure, the applicant must present evidence of medically documented systolic or diastolic failure, resulting in (i) "persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living;" or (ii) three or more separate episodes of acute congestive heart failure within a 12-month period; or (iii)

inability to perform an exercise tolerance test at a workload equivalent to 5 METs or less. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.02.

There is no evidence in the record indicating that Martinez's symptoms fulfill any of the above-listed criteria for a finding of a per se disability. Martinez reported that his daily activities included playing on his computer, going to school, hanging out with his friends, and occasionally going to the gym or dance classes. Although he was unable to play certain spots or do "extreme workouts," he had a fairly active lifestyle and was able to initiate, sustain and complete activities of daily living. (AR 195.) Furthermore, Martinez was able to perform an exercise tolerance test at a workload of 13 METs – a result that Dr. Gauthier characterized as "excellent" and "far above what it takes to perform work as on the proposed RFC." (AR 393.) At the hearing before the ALJ, Dr. Chandrasekhar testified that none of Martinez's impairments met the requirements of a Listing impairment. This conclusion is support by the findings of Martinez's treating physician, Dr. Steinberg, who opined that he had no restrictions on his ability to perform work-related activities, and generally concluded that there was no need for Martinez to observe any physical restrictions. Similarly, consulting physicians Drs. Perez and Kropsky both concluded that Martinez was limited only from activities that required moderate to severe exertion. There is substantial evidence to support the ALJ and Appeal Council's findings that Martinez does not have an impairment or combination of impairments that meets or medically equals any Listing disability.

### 3.      Residual Functional Capacity

Before proceeding to step four, the ALJ determined Martinez's RFC. The ALJ acknowledged that the medical evidence demonstrated that Martinez had a history of congenital heart defects, for which he underwent surgery for tetralogy of fallot at age one, and for a

pulmonary valve replacement in 2010.[4] He noted that Dr. Torres reported that Martinez would need close follow-up and has some limitations in his activities due to his heart condition.

The ALJ gave "significant weight" to the appointment notes and opinions of Martinez's treating physician, Dr. Steinberg. On an echocardiogram taken in August 2011, Dr. Steinberg observed a bioprosthetic valve with mild stenosis and mild to moderate insufficiency. At a follow-up appointment in January 2012, Dr. Steinberg reported that Martinez was doing well and denied any palpitations, dizziness, syncope, chest pain or other cardiac symptoms. In a report dated July 23, 2012, Dr. Steinberg assessed Martinez's ability to perform work functions, and found that he had no significant limitations.

The ALJ also afforded "significant weight" to the opinions of consultative examiners, including Drs. Kropsky and Perez. At his appointment with Dr. Kropsky, Martinez stated that he was able to walk up to 15 blocks and climb up to 3 flights of stairs, but added that he grew tired easily. Martinez also said that he was never able to participate in sports, and became short of breath when running. Dr. Kropsky's physical exam revealed a grade 3-4/6 systolic murmur with prominent second sound. Dr. Kropsky diagnosed Martinez with congenital heart disease, and concluded that he was limited from performing activities that required moderate to severe exertion because of easy fatigability. The ALJ noted that Dr. Krospky's findings were corroborated by Dr. Perez, who opined that Martinez should avoid activities of moderate or greater exertion.

The ALJ also gave significant weight to Dr. Chandrasekhar's testimony that Martinez's condition did not meet or medically equal any Listing impairment, and that there was no evidence that Martinez should be restricted from performing the full range of sedentary work.

---

[4] The ALJ misstated the date of Martinez's pulmonary valve replacement surgery, which actually took place on July 14, 2009.

Finally, the considered Martinez's own testimony, "especially his acknowledgment that he is able to perform sedentary work activities." (AR 21.) The ALJ concluded that since March 17, 2012, the Martinez has had the RFC to perform the full range of sedentary work, as defined in 20 C.F.R. 416.967(a).

After a thorough review of the record, the Court finds that the ALJ's assessment of Martinez's RFC is supported by substantial evidence and reflects no legal error. Although Martinez presented evidence of recurring, occasional chest pain and shortness of breath resulting from strenuous exercise, all of the medical and opinion evidence indicates that he retains the capacity to perform sedentary work. His doctors unanimously determined that he was capable of performing sedentary work and was only limited with respect to activities that required moderate to extreme exertion. Plaintiff's own statements, including his testimony before the ALJ, further support the ALJ's determination. In a disability report to the Commissioner, Martinez reported that he had worked as a camp counsel in summer 2007 and performed office work from summer 2008 through fall 2010. Martinez stated that he was able to perform daily activities, such as use public transportation, go shopping, and hang out with his friends. He also reported regularly visiting the gym and attending Spanish dance practice. At the April 2012 hearing before the disability officer, Martinez stated that he might be able to handle a job at a fast food restaurant. His mother also corroborated this, saying "he might be able to get a job at McDonald's but has too much school work." (AR 85.) At the hearing before the ALJ, Martinez testified that he could "probably handle" a job that only involved sitting down and performing office work. (AR 48). There is no evidence in the record that supports a conclusion that Martinez is incapable of performing sedentary work. Accordingly, the ALJ's findings rest on substantial evidence and are affirmed.

### 4.      Disability Determination

At step five, the ALJ determined that based on Martinez's age, education, lack of past relevant work, and ability to perform the full range of sedentary work, "there are jobs that exist in significant numbers in the national economy that claimant can perform." (AR 22.) He then concluded that under Medical-Vocational Rule 201.27, Martinez was not disabled as of March 17, 2012. The Appeals Council's decision amended the ALJ's ruling to correct the date on which Martinez was no longer disabled to March 17, 2011.

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2." Rosa, 168 F. 3d at 78 (quoting Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986) (internal quotation marks omitted). The Grid takes into account the claimant's residual functional capacity, age, education and prior work experience, and yields a decision of "disabled" or "not disabled." See Mezzacappa v. Astrue, 749 F. Supp. 2d 192, 206 (S.D.N.Y. 2010) (citing 20 CFR § 404.1569 & Subpt. P, App. 2, 200.00(a)). "Generally the result listed in the Grid is dispositive on the issue of disability," except in instances where "the medical-vocational guidelines fail to accurately describe a claimant's particular limitations." Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).

Under Medical-Vocational rule 201.27, a high school graduate between the ages of 18 and 44 with no prior work experience and who is capable of performing the full range of sedentary work is classified as "not disabled." Because Martinez's limitations are exertional and the guidelines accurately described his limitations, there was no need for the ALJ to deviate from the Grid's guidelines. Accordingly, the ALJ correctly concluded that Martinez is not disabled.

### B.     New Evidence

Martinez attached various documents to his complaint, including two that post-date the Appeals Council's decision. Under 42 U.S.C. § 405(g), the Court may remand a case "upon a showing that there *is new evidence* which is *material* and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (emphasis added); <u>see also</u> 20 C.F.R. §§ 404.970, 416.1570(b); <u>Perez v. Chater</u>, 77 F.3d 41, 44–46 (2d Cir. 1996); <u>Tirado v. Bowen</u>, 842 F.2d 595, 597 (2d Cir. 1988); <u>Canales v. Comm'r of Soc. Sec'y</u>, 698 F. Supp. 2d 335, 341 (E.D.N.Y. 2010). Evidence is new if it did not exist before the ALJ decision and it is not merely cumulative of evidence already in the record. <u>Tirado</u>, 842 F.2d at 597. Evidence is material where it "relates to the period on or before the date of the [ALJ] hearing decision," 20 C.F.R. § 404.970(b), is probative, and there is "a reasonable possibility" that it would have influenced the ALJ's decision. <u>Tirado</u>, 842 F.2d at 597; <u>see also</u> 20 C.F.R. § 416.1570(b). Documents generated after the ALJ rendered a decision are not categorically barred so long as the documents are relevant to the time period, before the ALJ's decision, for which benefits were denied. <u>Pollard v. Halter</u>, 377 F.3d 183, 193 (2d Cir. 2004). <u>See</u> 20 C.F.R. § 416.330 (a disability claim remains in effect through the decision of the ALJ). This is because new evidence may "disclose the severity and continuity of impairments existing" before the ALJ's decision and "may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations" previously. <u>Lisa v. Sec'y of Dep't of Health and Human Servs.</u>, 940 F.2d 40, 44 (2d Cir. 1991) (quotation marks and citations omitted).

The two documents that Martinez submitted with his complaint are not material because they are cumulative and support the ALJ's determination. In his November 11, 2014 letter, Dr.

Singh wrote that Martinez has "residual biventricular dysfunction . . .which we are treating medically and gradually uptitrating medications." (Compl. 5.) He also noted that Martinez had a "long standing history of chest pains that have been difficult to treat" and a "history of palpitations that are under treatment." Id. Dr. Singh wrote that Martinez would "likely require several more valve replacement surgeries throughout his life" and concluded that he was limited from certain exercises and from participating in competitive sports. He concluded that "[Martinez] has made excellent strides – though he will continue to need close follow up given his chronic medical condition." Id. The information in Dr. Singh's letter is fully consistent with the medical evidence and reports from Dr. Steinberg and the SSA's consultative physicians. Likewise, Dr. Singh's October 13, 2014 visit summary does not contain any new or material information. Because these documents fully support the ALJ's finding that Martinez is not disabled, remand for consideration of this new evidence is unwarranted.

### C.      Repayment of SSI Benefits

Along with his complaint, Martinez submitted a statement arguing that, due to financial hardship, he should not be required to repay the SSI benefits that he elected to collect during the pendency of his administrative appeal. The Commissioner argues that Martinez's argument is premature, because the Commissioner's request for repayment is not a final decision reviewable by this Court.

If the Commissioner finds that more than the correct amount of SSI benefits have been paid to or on behalf of an SSI recipient, she is authorized to recover the amount of overpayment. 42 U.S.C. § 1383(b)(1). If a claimant elects to continue receiving SSI benefits during the pendency of an administrative appeal, and the Commissioner affirms that they are no longer eligible for benefits, the additional benefits paid pursuant to that election are considered

overpayments. 42 U.S.C. § 1383(a)(7)(B). The Commissioner may waive recovery of an overpayment if she finds: "(1) the recipient was without fault; and (2) recovery would defeat the purposes of the Act's SSI provisions, be against equity and good conscience, or impede efficient or effective administration of the SSI program because of the small amount involved." Peralta ex rel. Peralta v. Barnhart, 204 F. Supp. 2d 534, 537 (E.D.N.Y. 2002) (citing 42 U.S.C. § 1383(b)(1)(B); 20 CFR § 416.550).

An individual may seek waiver of repayment on the grounds of financial hardship. See 20 CFR § 416.553. If the waiver request is denied, the Commissioner must notify the claimant in writing and provide him with the dates of a file review and personal conference. See 20 CFR § 416.557. At the personal conference, the claimant has the opportunity to present testimony and evidence in support of his waiver request. Id. If he is denied waiver after the personal conference, then he may request reconsideration. If he is denied waiver again on reconsideration, then the claimant may request a hearing before an ALJ. See 42 U.S.C. § 1383(c)(1)(A). Only the final determination of the Commissioner after a hearing is subject to judicial review. See 42 U.S.C. § 405(g).

Before seeking judicial review from this Court, Martinez must request a waiver of repayment of his SSI benefits and, if necessary, follow the prescribed review procedures as described above. Because the Commissioner's request for repayment is not a final decision reviewable by this Court, the Court will not address Martinez's waiver claim at this time.

## **CONCLUSION**

The ALJ's finding that Martinez is not disabled was based on substantial evidence and free of legal error. Accordingly, the Commissioner's motion for judgment on the pleadings is GRANTED, and the case is dismissed with prejudice.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            May 3, 2016